**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION; THE ATTORNEYS GENERAL OF THE STATES OF CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, IDAHO, ILLINOIS, IOWA, KANSAS, LOUISIANA, MARYLAND, NEVADA, NEW YORK, NORTH CAROLINA, AND WASHINGTON; THE PEOPLE OF THE STATE OF CALIFORNIA; THE COMMONWEALTHS OF PENNSYLVANIA AND VIRGINIA; AND THE HAWAII OFFICE OF CONSUMER PROTECTION, | |
| Plaintiffs, | **REPORT AND RECOMMENDATION** |
| v. | **22-cv-4260 (GRB) (ST)** |
| HARRIS ORIGINALS OF NY, INC., a corporation, CONSUMER ADJUSTMENT CORP. USA, a corporation, CONSUMER ADJUSTMENT CORP., a corporation, and 800 PRIME PLACE PROPERTIES LLC, a limited liability company, Defendants. | |

**TISCIONE, United States Magistrate Judge:**

On July 20, 2022, the Federal Trade Commission (the "FTC") and eighteen State Attorneys

General (the "State Attorneys General") (collectively, "Plaintiffs") entered a stipulated order for

permanent injunction, monetary judgment, and other relief with Harris Originals of NY, Inc., Consumer Adjustment Corp. USA, Consumer Adjustment Corp., and 800 Prime Place Properties LLC (collectively, "Defendants" and together with Plaintiffs, the "Parties").  The Court signed and entered the stipulated order (the "Order") on July 21, 2022.  Now before this Court is Plaintiffs' contempt motion, styled as a motion to "lift suspension of the stipulated judgment or compel Defendants' compliance with the Order" (the "Motion").

For the reasons discussed below, this Court respectfully recommends that the District Court GRANT IN PART and DENY IN PART the Motion, find Defendants in contempt for their violation of the Order, and impose the remedial penalties described herein, including granting Plaintiffs leave to move for attorneys' fees.

## **BACKGROUND**

### I.    THE COMPLAINT'S ALLEGATIONS

The Court assumes the Parties' familiarity with the Complaint and will only briefly summarize the facts alleged, recognizing that Defendants have neither admitted nor denied the Complaint's allegations, except as specifically stated in the Order.  *See* Order ¶ 3, ECF No. 28. Plaintiffs are the FTC and eighteen State Attorneys General.[1]  Defendants, although now purportedly "out of business,"[2] were allegedly, at times relevant to the Complaint, New York corporations with their principal place of business located at 800 Prime Place, Hauppauge, New York 11788.  Compl. ¶¶ 12–15, ECF No. 1.  Defendants allegedly owned and operated

---

[1] The State Attorneys General include: the Attorneys General of Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maryland, Nevada, New York, North Carolina, and Washington; the People of the State of California, the Commonwealths of Pennsylvania, and Virginia; and the Hawaii Office of Consumer Protection.

[2] *See* Defs.' Br. at 27, ECF No. 52.  Notably, the Order itself mandates that Defendants cease business and promptly dissolve within nine months of the Independent Monitor's final certification that Defendants have satisfied their obligation to offer and provide refunds as required and completed all other obligations under the section entitled "Monetary Judgement and Other Related Provision."  Order § I.

approximately 19 retail stores nationwide, that sold jewelry, watches, military-themed merchandise, and other ancillary products.[3]  Two of the stores were located on U.S. military bases, while the rest were near military bases.  *Id.* ¶ 18.

Defendants primarily sold their products to servicemembers on credit through retail installment contracts.  *See id.* ¶¶ 7, 20.  To facilitate installment contract sales, Defendants allegedly presented consumers with the "Harris Program," an in-store financing program portrayed as a credit improvement program.  *Id.* ¶ 29.  Defendants allegedly employed various tactics to convince servicemembers that buying products through the Harris Program would increase their credit scores and lead to other financial benefits.  *See id.* ¶¶ 24–43.  For example, Defendants would allegedly represent that the Harris Program would significantly improve consumers' credit scores and therefore lower borrowing costs in the future.  *Id.* ¶ 29.  Defendants made these representations, according to Plaintiffs, without regard to consumers' credit history, potential future borrowing, or other future financial decisions.  *Id.*  Defendants also made these representations despite allegedly knowing that many servicemembers would not make timely payments, which could decrease their credit scores.  *Id.* ¶ 35.

In addition to selling merchandise, Defendants sold Jewelry and Watch Protection Plans ("JWPPs"), which covered ring and watch sizing, watch battery replacements, and other repairs.  *Id.* ¶¶ 12–15, 18–19, 42.  Although JWPPs were optional, Defendants would allegedly add on JWPPs to retail installment contracts without consumers' express, informed consent—supposedly treating the JWPPs as required components of the contracts, rather than  optional, add-on products.  *Id.* ¶¶ 6, 42, 43.  According to Plaintiffs, some consumers were unaware that their installment contracts even included JWPPs.  *Id.* ¶ 43.

---

[3] Defendants also had a website: www.harrisjewelry.com.  Compl. ¶ 18.

On July 20, 2022, Plaintiffs filed a Complaint alleging that these practices, among others, violated federal and state laws.[4]  On the same day, the Parties jointly filed a proposed stipulated order for permanent injunction, monetary judgment, and other relief, which the Honorable Gary R. Brown signed and entered on July 21, 2022.   *See* Order.  Generally, the Order purports to resolve all disputes between the Parties, including all civil claims and investigations concerning Defendants' alleged conduct.  *See generally id.* ¶ 4.  Both Parties acknowledge that the Order was the result of prolonged negotiations.[5]

## II.   THE ORDER

The Order's stated purpose is to:

(1) resolve and dismiss with prejudice all pending litigation and conclude any investigations by any of the Plaintiffs into any of the Defendants in connection with conduct described in this Order or the accompanying Complaint; (2) eliminate any balances on retail installment contracts and any other consumer indebtedness with Defendants; (3) provide restitution of amounts paid for Lifetime Jewelry and Watch Protection Plans, as set forth below; (4) provide refunds to consumers on overpayments made on their accounts; (5) vacate any monetary judgments against consumers; and (6) request the elimination of all negative trade lines against any consumers reported by Defendants to a Consumer Reporting Agency. These objectives are in addition to the injunctive relief, other monetary payments, guarantee, and suspended penalty provided for in this Order.

*Id.* ¶ 7.  To achieve its purpose, the Order sets forth several requirements for Defendants.  Most relevant here, the Order requires Defendants to offer and pay restitution as refunds to consumers.  *See id.* § X.  Section X. C. of the Order provides:

Defendants are ordered to place funds sufficient to place $2.725 million in escrow held by a bank **for no purpose other than to provide such restitution as refunds to consumers** under this Order and to be released at the direction of the Independent Monitor as such funds are needed to cover issued refund checks. Such payment into escrow must be made within 30 days of entry of this Order by

---

[4] According to Plaintiffs, Defendants' conduct violated: the Federal Trade Commission Act; the Truth in Lending Act; the Electronic Fund Transfer Act; the Military Lending Act; the Trade Regulation Concerning Preservation of Consumers' Claims and Defenses; various federal regulations related to those statutes; and various state laws prohibiting unfair and deceptive trade practices.  *See generally* Compl.
[5] *See* Pls.' Mem. Law at 5, ECF No. 49-8; Defs.' Br. at 3.

electronic fund transfer. The parties understand that the amount placed into escrow does not create a cap on the amount of restitution, and that **Harris will pay 100 percent of eligible claimed refunds.** Any funds remaining in escrow will be returned to Defendants following the Independent Monitor's final certification that Defendants have satisfied their obligation to offer and provide refunds as required under this Order.

*Id.* § X. C. (emphasis added).

Section X. D. of the Order specifically requires Defendants to offer and pay restitution to consumers who purchased JWPPs. *See id.* § X. D. The section also requires Defendants to designate an Independent Monitor to review Defendants' compliance with the Order. *See id.*

Section X. D. provides:

**Defendants are ordered to offer restitution to all consumers who entered into a retail installment contract containing a Lifetime Jewelry and Watch Protection Plan ("JWPP")** between January 1, 2014, and entry of this Order and who paid for said JWPP in full or in part; **restitution shall be in the full amount of JWPP purchases paid for by the consumer, and excluding those amounts for which Harris has ceased collections or written off** *(see* X.G below).[6] (This amounts to approximately $10.9 million in potential refunds.) Upon sending of the notification letter described below in Section D.3 and attached hereto (Attachment F), Defendants will no longer be required to provide any services relating to the JWPP, including but not limited to jewelry repair.

1. Within 10 days of entry of this Order, Defendants shall provide a list of all consumers entitled to restitution for a JWPP purchase-including each consumers' last known email and mail address-to the New York Attorney General, serving as representative of the State Attorneys General.

2. Within 10 days of entry of this Order, Defendants shall provide to the New York Attorney General, serving as representative of the State Attorneys General, the name and contact information of a Person to serve as an independent monitor of the Defendants' refunds to consumers in this Order ("Independent Monitor"). The Independent

---

[6] Section X. G. provides: "No later than 10 business days of entry of this Order, Defendants shall cease collecting on all Covered Consumer Debt, disable the online payment mechanism, and notify any collection agency to cease such collection efforts. Within 10 days of receipt of payment by any third party collecting Covered Consumer Debt, Defendants will return payment and notify third party collector to cease future payments. Within 30 business days of entry of this Order, Defendants shall (1) request and make a good faith effort to recall, purchase, or otherwise obtain any Covered Consumer Debt that Defendants have referred, sold, assigned, or otherwise transferred to any collection agency or other third party and (2) write-off all Covered Consumer Debt from Defendants' account management systems." Order § X. G.

Monitor must be a qualified, objective, independent third-party professional with experience in assessing monetary relief to consumers. Defendants must provide to the New York Attorney General, serving as representative of the State Attorneys General, the specific qualifications of the Independent Monitor. If the New York Attorney General, serving as representative of the State Attorneys General, notifies Defendants that it disapproves of Defendants' Independent Monitor choice, Defendants shall submit, within 30 days, to the New York Attorney General, an alternate selection for the Independent Monitor.

3. Within 30 days of appointment of the Independent Monitor, **Defendants shall send a notification letter to each such consumer** to their last known email address on file for the consumer and by first-class mail, postage paid, to the last known mail address on file, using the attached notification letter (Attachment F), in no less than 12-point font, with no other document, enclosure, or attachment. For any consumer whose notice is returned as undeliverable, Defendants shall, within fourteen days after a returned notice was received, provide to the New York Attorney General, as representative of the State Attorneys General, the name and last-known email and mail addresses of such consumers.

4. **For any consumer who does not respond to the first notification letter within 60 days of mailing, Defendants shall send a second notification letter** to their last known email address on file for the consumer, using the attached notification letter (Attachment F), in no less than 12-point font, with no other document, enclosure, or attachment. **Defendants shall post on the homepage of their website, information shown in Attachment G,** in no less than 12-point font, regarding the refund process identified herein, including the notification to consumers and a telephone and email address at which to reach Defendants if consumers have questions, to coincide with the initial notification sent to consumers, **and retain that information on their website for nine months after the initial notification. The notification letter and the website information may be modified from those in the Attachments upon written agreement of the parties or by order of the Court**.

5. For each consumer who responds to the notification letters or emails or otherwise, **Defendants shall,** within 30 days of receipt of response from the consumer, **refund the full amount paid by the consumer for the JWPP, including sale tax, finance charges, and any other amounts the consumer paid attributable to the JWPP**, by providing a refund to the source of the initial charge (such as debit card or other EFT), or, if that option is not available, issue a check to the consumer by first class mail.

6. Beginning no later than 90 days of the first notice, Defendants must provide initial and subsequent quarterly reports of the refunds ("Refund Reports") to the New York Attorney General and Independent Monitor. The Refund Reports shall include, at a minimum: the names of consumers who were sent notices, the names of consumers who contacted the company regarding JWPP refunds but were not eligible (including in response to a notice), and the names of consumers who were provided a JWPP refund. The Independent Monitor shall review and, if the Monitor has no concerns, approve the Refund Reports. Within 10 days of approval by the Independent Monitor, the Independent Monitor shall provide notice to the New York Attorney General of that approval. Defendants must also provide to the New York Attorney General all records pertaining to the Refund Reports upon completion of each such Refund Report.

7. **No sooner than 180 days after the second notification letter, the Independent Monitor shall provide** the New York Attorney General, as representative of the State Attorneys General, and Defendants **written initial certification that Defendants have satisfied their obligation to offer and provide JWPP refunds** as required under this Order. **After adequately addressing any questions raised by the New York Attorney General or Defendants regarding the completeness of JWPP refunds, but no sooner than 30 days after the date of the initial certification, the Independent Monitor shall provide** to the New York Attorney General and Defendants **a written final certification that Defendants have satisfied their obligation to offer and provide JWPP refunds** as required under this Order.

*Id.* § X. D. (emphasis added).

As stated in Section X. D. 4, the Order requires Defendants to post "information shown in Attachment G" on the homepage of their website and "retain that information on their website for nine months after the initial notification."  Attachment G contains the following:

**IMPORTANT: You May be Eligible for a Refund from Harris Jewelry/CACUSA**

Because of a recent settlement with the Federal Trade Commission and a group of State Attorneys General,* **you may be eligible for a refund from Harris Jewelry.**

**You may be able to get a <u>full refund</u> of the amount you paid for a Lifetime Jewelry and Watch Protection Plan.** Additionally, if you currently have an outstanding debt to Harris/CACUSA, <u>you don't have to make any more payments</u>. Your account balance is now $0.

**Don't wait, apply for your refund now.** Click here and enter your name and contact information.

**Harris Jewelry will be closing down soon** and is no longer accepting requests for jewelry repair, battery replacement, and other services covered by the Protection Plan.

If you have questions, please call Harris Jewelry at 1-800-989-7732, Monday through Friday from 9:00am – 5:30pm EST or email info@harrisjewelry.com.

To learn more about the settlement, read the Federal Trade Commission's press release [embedded link] or call the New York State Attorney General's Office at (315) 523-6080.

* The Attorneys General of the states of California, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maryland, Nevada, New York, North Carolina, Pennsylvania, Virginia, Washington, and the Hawaii Office of Consumer Protection ("State Attorneys General").

Attachment G (emphasis in original).

The Order provides for a $24,000,000 stipulated judgment should Defendants fail to comply with the Order. Section X. A. of the Order provides:

Suspended judgment in the amount of Twenty-Four Million Dollars ($24,000,000.00) is entered in favor of State Attorneys General against Defendants, jointly and severally, as equitable monetary relief, payable in the event Defendants fail to honor the terms of this Order.

Order § X. A.

## III. THE INSTANT MOTION

In their Motion, Plaintiffs claim that Defendants have violated the Order in at least two ways. First, Plaintiffs claim that Defendants prematurely removed the information shown in Attachment G from their website—including the consumer refund claims portal contained therein (the "claims portal")—in violation of Section X. D. 4 of the Order. Second, Plaintiffs claim that

8

Defendants, by supposedly miscalculating restitution, did not fully refund consumers for their JWPP purchases, in violation of Section X. D. of the Order.[7]

The Parties do not generally dispute the events preceding the Motion's filing.  Rather, the Parties dispute the Order's meaning and, consequently, whether Defendants' conduct violated the Order.  For Defendants' purported violations, Plaintiffs ask the Court to lift the suspension of the Order's $24,000,000 judgment or compel Defendants' compliance with the Order.

On August 4, 2023, Plaintiffs filed the Motion.[8]  *See* Mot., ECF Nos. 49, 50.  On the same day, Defendants filed their Response in Opposition to the Motion.  *See* Defs.' Resp. Opp'n, ECF No. 52.  Plaintiffs then filed their Reply in Support of the Motion.[9]  *See* Pls.' Reply Supp., ECF No. 53.  On December 18, 2023, the Honorable Gary R. Brown referred this Motion to this Court for Report and Recommendation.  *See* Docket Order, dated December 18, 2023.  On January 3, 2024, this Court heard oral argument on the Motion.  *See* Minute Order, ECF No. 56.

---

[7] The FTC only joins the Motion as to the first argument concerning Defendants' premature removal of the website and claims portal. Pls.' Mem. Law at 3 n.1.  Therefore, the Court does not, when discussing the second argument, consider the term "Plaintiffs" to include the FTC, unless otherwise noted.

[8] In a footnote, Defendants claim that they were prejudiced by some of the State Attorneys General joining in the Motion nineteen days after the NYAG served it.  *See* Defs.' Br. at 3 n.1.  Defendants ask the Court to strike this "improper modification" or allow Defendants "leave to file a Sur-Reply."  *See id.*  Putting aside that "courts in this Circuit have made clear that arguments in footnotes are waived," *Williams v. City of New York*, 19-CV-3347 (LJL) (JLC), 2022 WL 130409, at *24 n.15 (S.D.N.Y. Jan. 14, 2022), Defendants do not explain how this "modification" prejudiced them.  The State Attorneys General are not new to this action, and they do not make any additional substantive arguments.  Accordingly, this Court recommends declining Defendants' request.

[9] In their reply brief, Plaintiffs note that Defendants' opposition brief totals 30 pages—five pages over this Court's 25-page limit.  *See* Pls.' Reply Br. at 2 n.2.  However, under Judge Brown's Individual Practice Rules, which govern this Motion, "Unless prior permission has been granted, memoranda of law in support of, and in opposition to, motions are limited to 20 pages."  Individual Prac. R. II. b.  Therefore, *both* Plaintiffs' Memorandum of Law in Support of the Motion, and Defendants' Brief in Opposition, violate the applicable page limit.  However, given the Motion's complexity, the Order's length, the lengthy history of communications between the Parties, and the fact that the Court's Individual Practice Rules are discretionary, this Court will consider both Parties' full briefing and not enforce the page limit against either Party.

## LEGAL STANDARD

### I.    CONTEMPT

Courts have the inherent power to enforce compliance with their orders through civil contempt.  *Armstrong v. Guccione*, 470 F.3d 89, 102 (2d Cir. 2006); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("the power to punish for contempt is inherent in all courts." (internal citations and quotation marks omitted)).  Even so, contempt is a "potent weapon . . . that is inappropriate if there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009) (internal citations and quotation marks omitted).

To prevail on a motion for contempt, the movant must show that, "(1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016); *see Weston Cap. Advisors, Inc v. PT Bank Mutiara, Tbk*, 738 F. App'x 19, 21–22 (2d Cir. 2018).  The violation need not, however, be willful.  *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004).

### II.   CONSENT ORDER INTERPRETATION

"The basic principles governing interpretation of consent decrees and their underlying stipulations are well known."  *Doe v. Pataki*, 481 F.3d 69, 75 (2d Cir. 2007).  As "consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts . . . ."  *U.S. v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975); *see U.S. ex. rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty., N.Y.*, 712 F.3d 761, 767 (2d Cir. 2013) (noting that ordinary rules of contract interpretation generally apply to consent decrees);

*E.E.O.C. v. Fed. Express Corp.*, 268 F.Supp.2d 192, 206 (E.D.N.Y. 2003) ("It is well settled that consent decrees are construed primarily as contracts and derive their legal force largely from the parties' voluntary agreement."). "Moreover, contracts with the federal government are governed by federal common law . . . which incorporates the core principles of the common law of contracts that are in force in most states." *Fed. Express Corp.*, 268 F.Supp.2d at 204; *see Powell v. Omnicron*, 497 F.3d 124, 129 n.1 (2d Cir. 2007) ("New York law and federal common law [are] materially indistinguishable").

"A fundamental precept of contract law is that agreements are to be construed in accordance with the parties' intent." *In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 122 (2d Cir. 2014). "This requires that deference be paid to the plain meaning of the language of a decree and normal usage of the terms selected." *Anti-Discrimination Ctr. of Metro New York*, 712 F.3d at 767. Indeed, "[t]he best evidence of what the parties intended is what they say in their writing." *In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d at 122 (internal citations and quotation marks omitted).

Ultimately, a "consent decree represents a compromise between parties who have waived their right to litigate in the interest of avoiding the risk and expense of continued litigation." *Baez v. New York City Hous. Auth.*, 533 F.Supp.3d 135, 141 (S.D.N.Y. 2021). "Each has given up something they might have won had they proceeded with the litigation. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Id.* (cleaned up) (citing *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971)). A consent decree "must be construed as it is written." *Armour & Co.*, 402 U.S. at 682.

## DISCUSSION

### I.     THE CLAIMS PORTAL

Plaintiffs first argue that Defendants violated the Order when they prematurely deactivated their website and the claims portal.  This Court agrees and recommends finding Defendants in contempt for this violation.

The Order requires Defendants to "post on the homepage of their website, information shown in Attachment G . . . and retain that information on their website for **nine months** after the initial notification."  Order § X. D. 4 (emphasis added).  Critically, Attachment G contains the following: "Don't wait, apply for your refund now.  **Click here** and enter your name and contact information."  Attachment G. (emphasis added).

On April 20, 2023, before nine months had elapsed from Defendants' initial notification letter,[10] Defendants deactivated their website and the claims portal.  Defs.' Br. at 15.  The next day, in accordance with Section X. D. 7 of the Order, the Independent Monitor, Kenneth G. Yormark, issued his initial certification to the Parties.  *See* Nelson Decl. Ex. A.  On May 3, 2023, the New York Attorney General's office (the "NYAG") emailed Mr. Yormark, copying Defense Counsel, with "questions and concerns for follow up" regarding the initial certification.   Baker Decl. Ex. B, ECF No. 52-3.  Indeed, the Order provides for a minimum 30-day period, in between the Independent Monitor's initial certification and final certification, for the Independent Monitor to address the Parties' questions.  *See* Order § X. D. 7.

The NYAG's first inquiry in its May 3, 2023, email concerned Defendants' removal of the information shown in Attachment G, and claims portal, from their website.  The NYAG stated:

---

[10] Defendants sent the First Notification letters to consumers, per Section X. D. 3. of the Order, on August 23, 2022. *See* Nelson Decl. Ex. A, ECF No. 50.  Defendants sent the Second Notification letters, per Section X. D. 4. of the Order, on October 21, 2022.  *See id.*

> Harris has removed the claims notice/link from its website prior to the conclusions of the claims process. Although the order is silent as to when the notice and link must remain available, we reasonably expected it to remain up until the claims process, including the reporting period is concluded. We respectfully request that the websites and claims process be restored immediately and remain available until at least the time that the final report is disseminated.

Baker Decl. Ex. B.  On May 5, 2023, the NYAG's office sent another email to Mr. Yormark, copying Defense Counsel, stating:

> For further detail, please note also that X.D.4 of the Order refers to defendants' posting the website information, etc., to coincide with the Initial Notification sent to consumers, and retaining the information for nine months after the Initial Notification. Nine months did not pass prior to the removal of the website and notice posting.

Nelson Decl. Ex. F, ECF No. 49-7.

On May 10, 2023, Mr. Yormark responded to the NYAG's May 3, 2023, email, copying Defense Counsel.  Baker Decl. Ex. B.  In response to the first inquiry, Mr. Yormark wrote:

> The consent order states, "a telephone and email address at which to reach Defendants if consumers have questions, to coincide with the initial notification sent to consumers, **and retain that information** on their website for nine months after the initial notification."

> The March 22, 2023 press release states "New York Attorney General Letitia James today issued an alert reminding servicemembers and veterans to file claims to receive refunds from the Harris Jewelry settlement before the April 15th deadline."

> I agree with the AGs office's request that the website should be reopened and available for questions. Based on the press release and the reading of the consent order I believe the ability to file a refund request should be discontinued as of April 15th . (Harris kept the site open and available for refund requests until April 21st.) The website should be reopened until the latter of nine months after the initial notification or the completion of the reporting period for any inquiries.

*Id.* (emphasis in original).

Sometime thereafter, the NYAG and Mr. Yormark had a "productive call."  Baker Decl. Ex. F, ECF No. 52-7.  Then, on May 12, 2023, the NYAG sent another email to Mr. Yormark,

copying Defense Counsel, stating that the NYAG was "awaiting an update the website's revival."

*Id.* On May 17, 2023, the NYAG emailed Mr. Yormark again, copying Defense Counsel, stating:

> The Harris Jewelry website is still down, in ongoing violation of the Court Order. We await confirmation 1) that the website and the portal are back up and functioning; 2) that both will remain up and running for at least 30 days plus the duration that they have been down; and 3) that Harris will send out an email to consumers explaining such. While we have been happy with the company's attention to issues throughout the period, the removal of the website is of serious concern to the multistate group, and the ongoing disruption to the final claims period needs remedying. We expect confirmation from the company by the end of the today that the website will become functional, and the multistate will otherwise move forward with enforcement action.

Nelson Decl. Ex. F.

Later that day, Mr. Yormark emailed back, copying Defense Counsel, stating, "In the interest of making available information to consumers who timely submitted claims, the Harris website is up and functioning with the message below."  Nelson Decl. Ex. C, ECF No. 49-4.  The message on Defendants' website then read, according to Mr. Yormark:

> **IMPORTANT: If You Applied for a Refund from Harris Jewelry/CACUSA**
>
> Because of a recent settlement with the Federal Trade Commission and a group of State Attorneys General,\* certain consumers were eligible for relief from Harris Jewelry. You may have been able to get a full refund of the amount you paid for a Lifetime Jewelry and Watch Protection Plan. Details about when such claims had to be filed may be found here.
>
> **If you submitted your claim** and have a question about your refund, please email info@harrisjewelry.com In your email please include your **full name, last four digits of your Social Security number, your current address**, including any apartment number, and the reason for your inquiry, such as never received a check, lost the check, etc. You may also call 1-800-989-7732 Monday through Friday from 9:00am - 5:30pm ET with any questions.
>
> Additionally, if you had an outstanding debt to Harris/CACUSA at the time of the settlement, you don't have to make any more payments. Your account balance is now $0. To learn more about the settlement, read the Federal Trade Commission's press release

> \*The Attorneys General of the states of California, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maryland, Nevada, New York, North Carolina, Pennsylvania, Virginia, Washington, and the Hawaii Office of Consumer Protection ("State Attorneys General").

*Id.* (emphasis in original).

The next day, on May 18, 2023, the NYAG responded to Mr. Yormark, copying Defense Counsel stating:

> This notice does not comply with the Order or the States' request. The unapproved notice does not restore the claims period or provide any remedy for the untimely removal of same, moreover it falsely communicates information which is not established in the Order nor agreed to in our conference. Nothing in the Order authorizes the removal of the website, this unagreed-to change in website language, or a closing of the claims period prior to the certification of the final report. We are disappointed in these violations as well as the lack of timely communication from Harris regarding the States' concerns. If Harris is unwilling to reopen the claims period and provide corrective notice to consumers, we will bring the matter to Federal Court requesting enforcement of the Order and payment in full of the heretofore suspended penalties.
>
> Kindly respond before close of business as to whether Harris intends to correct this situation as previously proposed. Please consider this a good faith effort to remedy the violation.

Nelson Decl. Ex. F.  Later that day, the NYAG emailed Defense Counsel, copying Mr. Yormark, stating:

> Ex. G from the Order (attached hereto) is the notification required to be on the website and to be retained for nine months after the initial notification, only to be modified upon written agreement or Court Order. This provision was not modified by written agreement nor order of the Court. Exhibit G plainly provided a claims portal be included.
>
> The website notification (inclusive of claims portal) was removed prematurely, and the new notice was modified unilaterally by your clients-- both actions taken in violation of the mutually negotiated Order. The dampening impact of the removal and compounding impact of the new misinformation is damaging consumers and undermining the Order.
>
> The states demand that the website--with the exact language from Ex. G--be restored and the portal maintained, in full operation, for the number of days the website has been down (and still counting) plus one full month; and that an

additional notice be immediately emailed to consumers in an effort to cure the breach. We are willing to agree to a specified cut-off date for claims reflecting these deadlines so that all parties are in sync.

If Harris won't agree to this reasonable remedy, we will go to Court. This is the exact discussion we had last week. An additional meeting is not necessary.

*Id.* Discussions between the Parties and the Mr. Yormark continued regarding the website, claims portal, and other issues. *See id.* Defendants, however, concede that they never restored the claims portal to their website.

### A. Clear and Unambiguous Terms

For the Court to find Defendants in contempt of the Order, the Order's terms must be "clear and unambiguous." *CBS Broad. Inc.*, 814 F.3d at 98. An order is clear and unambiguous where it "leaves no uncertainty in the minds of those to whom the order is addressed." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142–43 (2d Cir. 2014) (internal citations and quotation marks omitted). If the parties cannot ascertain from the order's four concerns "precisely what acts are forbidden, the order cannot form the basis for contempt." *Id.* at 143 (internal citations and quotation marks omitted). "Whether a contract term is ambiguous is a question of law to be determined by the court." *Fed. Express Corp.*, 268 F.Supp.2d at 204. An agreement is ambiguous if it "suggest[s] more than one meaning when viewed objectively by a reasonably intelligent person." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).

Here, the Order's terms regarding the website and claims portal are "clear and unambiguous." *CBS Broad. Inc.*, 814 F.3d at 98. The Order clearly and unambiguously requires the "information shown in Attachment G," and thus the claims portal contained therein—by virtue of the "click here" language—to remain on Defendants' "website for nine months after the initial notification." Order § X. D. 4; Attachment G. The plain meaning of Section X. D. 4's language is unmistakable.

16

Defendants offer no reason to overlook the plain meaning of the language used in Section X. D. 4.   Instead, Defendants claim that Section X. D. 4 requires only that "contact information for consumers with questions" remain on the website, rather than the claims portal itself.[11]   *See* Defs.' Br. at 21.   This interpretation is untenable.

Defendants' interpretation, if correct, would render Attachment G superfluous.   *See Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous.").   Attachment G, on its face, evidences the parties' intent for the *entirety* of the attachment to be on Defendants' website.   Attachment G is specifically formatted, containing capitalized, bolded, and/or underlined words.   Defendants cannot credibly claim that the parties would format Attachment G in this way—let alone create the attachment at all—only to then allow Defendants to unilaterally decide which of the attachment's components to include on their website.

Defendants' interpretation also ignores the very language in Attachment G that allows consumers to access the claims portal.   As Section X. D. 4 incorporates Attachment G into the Order, its "text is necessarily relevant" to the Order's interpretation.   *See Baez*, 533 F.Supp.3d at 143.   Attachment G clearly and unambiguously states: "click here."   Defendants cannot simply— and conveniently—read "click here" out of the Order.   *See Bank of New York v. First Millennium, Inc.*, 598 F.Supp.2d 550, 557 (S.D.N.Y. 2009) ("an interpretation that gives reasonable and

---

[11] To support their interpretation of Section X. D. 4, Defendants rely on "the Independent Monitor's reading of the Order and recommendation to Defendants."   *See* Defs.' Br. at 22–24.   Defendants do not explain, however, why the Court should consider Mr. Yormark's opinion in interpreting an otherwise unambiguous provision of Order.   The Order does not require Mr. Yormark to make recommendations to Defendants concerning the information on their website.   Mr. Yormark is also not an attorney, let alone an attorney that Defendants retained.   Even if he were, an "advice of counsel defense may be considered in mitigation of punishment," but "does not absolve [Defendants] of liability." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 99-CV-10175 (KMW), 2021 WL 3418475, at *12 (S.D.N.Y. Aug. 5, 2021).

effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." (internal citations omitted)).

Defendants main, but unavailing, argument is that their decision to remove the claims portal when they did was consistent with Section X. D. 7.  As mentioned, Section X. D. 7 states:

> No sooner than 180 days after the second notification letter, the Independent Monitor shall provide . . . [the Parties] . . . written initial certification that Defendants have satisfied their obligation to offer and provide JWPP refunds as required under this Order. After adequately addressing any questions raised by the New York Attorney General or Defendants regarding the completeness of JWPP refunds, but no sooner than 30 days after the date of the initial certification, the Independent Monitor shall provide to the New York Attorney General and Defendants a written final certification that Defendants have satisfied their obligation to offer and provide JWPP refunds as required under this Order.

Order § X. D. 7.

Defendants focus on the "*have satisfied*" language in Section X. D. 7, claiming that the Independent Monitor could not have certified whether Defendants had satisfied their obligations under the Order if the claims portal were still open.  *See* Defs.' Br. at 20.  This argument is unpersuasive.  Section X. D. 7 requires the Independent Monitor to provide both an *initial* certification and a *final* certification, with a minimum 30-day period in between to address "any questions raised by the New York Attorney General or Defendants . . . ."  The "initial" certification is just that—initial.  Only the "final" certification is the operative certification that certifies Defendants' compliance with the Order.

Indeed, courts must consider an order's "particular words not in isolation but in the light of the obligations as a whole."  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) (internal citations and quotation marks omitted); *see also Baez*, 533 F.Supp.3d at 143 (the court interpreting a consent decree "holistically").  Here, the Court certainly considers Section X. D. 4 in the context of the Order "as a whole."  *See JA Apparel Corp.*, 568 F.3d at 397.  However,

18

*nothing* in Section X. D. 7, which merely provides the timeline for the Independent Monitor's initial and final certifications, negates, modifies, or otherwise impacts Section X. D. 4's nine-month mandate.

As Defendants cannot find any ambiguity on Section X. D. 4's face, Defendants introduce extrinsic evidence to create ambiguity that does not otherwise exist. *See* Defs.' Br. at 22–24. The Court will not consider such evidence where, as here, the Order is facially unambiguous. *See Baez*, 533 F.Supp.3d at 141 (internal citations omitted); *Charron v. Sallyport Glob. Holdings, Inc.*, No. 12-cv-6837, 2014 WL 7336463, at *16 (S.D.N.Y. Dec. 24, 2014) ("extrinsic evidence may not be introduced in an attempt to create ambiguity.").

Even though the Court need not discuss Defendants' extrinsic evidence any further, the Court notes that Defendants rely heavily on certain categories of extrinsic evidence. *See* Defs.' Br. at 14–16, 22–24. The first is the NYAG's May 3, 2023, email to Mr. Yormark, in which the NYAG commented, "Although the order is *silent* as to when the notice and link must remain available . . . ." Baker Decl. Ex. B. (emphasis added). The second is a series of press releases from the New York, Connecticut, and North Carolina states Attorneys General. *See* Defs.' Br. at 14–16, 22–24. Some of these press releases purport to identify April 15, 2023, as the deadline for Defendants' consumers to submit their refund claims. Not only are the May 3 email and press releases precisely the kind of extrinsic evidence courts will not consider in interpreting an order's unambiguous provisions, but they also do not modify the Order. Section X. D. 4 of the Order allows the "website information [to] be modified from those in the Attachments upon written agreement of the parties or by order of the Court." Order § X. D. 4. Neither the May 3 email nor the press releases constitute a written agreement of the parties or a court order.

The Court also notes that, at oral argument, Defense Counsel suggested that Plaintiffs should be "equitably estopped" from arguing that the claims portal should have been re-opened, "given that the public statements that they made [in the press releases] that are completely contradictory to that." Tr. Oral Arg. at 17: 21–25, 16: 1–3, ECF No. 57. However, as Defendants do not raise their equitable estoppel argument in their brief, the Court will not consider it here. *See Goldberg v. UBS AG*, 690 F.Supp.2d 92, 98–99 (E.D.N.Y. 2010) (collecting cases noting that courts will not consider arguments raised for the first time in oral argument).

### B. Clear and Convincing Proof of Noncompliance

Additionally, for the Court to find Defendants in contempt, proof of Defendants' noncompliance with the Order must be "clear and convincing." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2022). "The clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred." *Id.* (internal citations and quotation marks omitted). Here, proof of Defendants' noncompliance meets that standard. As Defendants concede, they "deactivated [their] website and the claim submission portal" on April 20, 2023. Defs.' Br. at 15. Although Defendants later re-activated their website, they never restored the information shown in Attachment G or the claims portal. Instead, they posted modified, unagreed-to language, in violation of Section X. D. 4. *See* Nelson Decl. Ex. C.

### C. Diligent Attempt to Comply in a Reasonable Manner

Finally, for the Court to find Defendants in contempt, Defendants must have failed to diligently attempt to comply with the Order in a reasonable manner. *See CBS Broad. Inc.*, 814 F.3d at 99. "[R]easonable diligence, at the very least, requires a party to develop reasonably effective methods of compliance." *Cricut, Inc. v. APA Tech. Ltd. Co.*, 698 F.Supp.3d 538, 548 (E.D.N.Y. 2023) (internal citations omitted). A party who complies with an order reluctantly,

reactively, or only after a prompting from its adversary, is not reasonably diligent.  *Id.*; *see E.E.O.C. v. Local 638*, 81 F.3d 1162, 1176 (2d Cir. 1996); *see also Sportco, Inc. v. TRT Tactical, LLC*, No. 14–CV–6044 (JG) (GRB), 2015 WL 3915618, at \*3 (E.D.N.Y. June 25, 2015) (holding that a party who did not comply with a consent judgment until after the other party's lawyers "complained of the violative behavior" was not reasonably diligent).  Rather, a party must energetically attempt "to accomplish what was ordered."  *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir. 1989) (internal citations omitted).

Here, Defendants did not diligently attempt to comply with the Order.  After violating Section X. D. 4 by prematurely removing the information shown in Attachment G and the claims portal from their website, Defendants' only, half-hearted attempt to remedy their violation came after repeated prompting from the NYAG.  *See* Nelson Decl. X. F.  A party who does not attempt to comply with an order until after the other party's lawyers "complain[] of the violative behavior" is not reasonably diligent.  *Sportco, Inc.*, 2015 WL 3915618, at \*3.

## II.   PAYMENT OF REFUNDS

Plaintiffs next argue that Defendants violated the Order by miscalculating, and therefore underpaying, JWPP refunds to consumers.  This Court disagrees and recommends not finding Defendants in contempt for this alleged violation.

As discussed, Section X. D. of the Order requires Defendants "to offer restitution to all consumers who entered into a retail installment contract containing a [JWPP] between January 1, 2014, and entry of this Order and who paid for said JWPP in full or in part."  Order § X. D.  Section X. D. then states that, "restitution shall be in the **full amount** of JWPP purchases paid for by the consumer, **and excluding those amounts for which Harris has ceased collections or written off**."  *Id.*  (emphasis added).

After receiving Mr. Yormark's initial certification, Plaintiffs also had questions concerning Defendants' calculation of JWPP refunds.  As such, in the May 3, 2023, email to Mr. Yormark, the NYAG also inquired:

> Defendants' counsel explained that certain consumers who had debt forgiveness in excess of the amount paid for a JWPP were not provided JWPP refunds. If true, this conflicts with our understanding that those consumers would receive refunds of any payments made towards JWPP, regardless of if they also received debt forgiveness, so long as it would not result in a windfall to the consumer (i.e., they could not have made zero payments and have the JWPP refunded). Please explain further the methodology used in these instances and identify how such accounts were handled.

Baker Decl. Ex. B.  In response, Mr. Yormark stated:

> Part X, Subpart D of the Consent Order provides, in pertinent part, that: "Defendants are ordered to offer restitution to all consumers who entered into a retail installment contract containing a Lifetime Jewelry and Watch Protection Plan ("JWPP") between January 1, 2014, and entry of this Order and who paid for said JWPP in full or in part; restitution shall be in the full amount of JWPP purchases paid for by the consumer, and excluding those amounts for which Harris has ceased collections or written off (see X.G below).

> Where the amount written off from a customer's account was greater than the product purchase price, the assumption is it included the JWPP purchase costs therefore no additional restitution should be owed to the consumer.

> **Harris does not have the ability to calculate (the consent order doesn't contemplate or discuss any formula for doing so) the breakdown in cost between the product and JWPP.**  If Harris were to provide payment for the entire JWPP they would be reimbursing the customer for more than they had paid creating a windfall.

Nelson Decl. Ex. F. (emphasis added).

Then, on May 30, 2023, Mr. Yormark provided a memo (the "May 30 Memo") describing Defendants' methodology for calculating JWPP refunds.  *See* Nelson Decl. Ex. D, ECF No. 50-1. The May 30 Memo summarized the methodology as follows:

> As per the Consent Order's terms, it is my understanding that Harris has calculated the restitutions related to written-off accounts under two scenarios:

      a)  Scenario 1: The balance written off surpasses the total JWPP purchases, resulting in no restitution owed ("'Scenario I'"); and

      b)  Scenario 2: The balance written off is less than the total JWPP purchases, thus the difference is paid as restitution ("'Scenario 2'").

Additionally, it is my understanding that the restitution calculation by Harris involves the following three main steps:

      a)  Quantification of the total JWPP purchases made during the Period.

      b)  Determination of finance charges related to JWPP purchases (the "JWPP Finance Charge") during the period.

      c)  Identification of sales taxes paid by the consumer related to JWPP purchases.

*Id.* at 1.  The May 30 Memo further explained:

A finance charge percentage is calculated ( the "F/C Percentage") and used to determine the JWPP Finance Charge. Specifically, the F/C Percentage is calculated by dividing the total finance charges by the total purchases during the entire period of activity, not solely the Period detem1ined in the Consent Order. For example, if a consumer's total purchases were $ 1,000 and the total finance charges were $150, the assumed F/C Percentage would be 15%. To determine the J\1/ PP Finance Charge, the total JWPP purchases during the period is multiplied by the F/C Percentage.

*Id.* at 1 n.1.

The May 30 Memo provided example calculations for Scenarios 1 and 2.  *Id.* at 1–3.  To summarize, the Scenario 1 example described:

In Scenario I, the account balance written off surpasses the total JWPP purchases, meaning no restitution is owed to the consumer. This can be exemplified using customer . . . Mr. Victor.  During the Period, Mr. Victor purchased two JWPPs, one on November 21, 2015 for $249.99 and another on February 12, 2022 for $279.99, collectively totaling $529.98.  The potential restitution owed related to these JWPP purchases is shown in the table below.

| Scenario 1 | | |
|---|---|---|
| Calculation of Potential Restitution Owed | | |
| Total JWPP Purchases during the Period [1] | A | $    529.98 |
| F/C Percentage | | |
| Total purchases by consumer [2] | B | 13,629.18 |
| Total finance charges on consumer account [3] | C | 2,354.19 |
| F/C Percentage | D = C/B | 17.28% |
| JWPP Finance Charge | E = A * D | 91.58 |
| Sales taxes | F | - |
| **Total potential resitution** | G = A + E + F | $   621.56 |
| **Notes** | | |
| [1]  See footnote 3 on Exhibit 2. | | |
| [2]  See footnote 1 on Exhibit 2. | | |
| [3]  See footnote 2 on Exhibit 2. | | |

On June 30, 2021, Mr. Victor's outstanding balance of $827.74 was written off . . . After calculating the potential restitution amount, it was determined that Mr. Victor was not due a refund, as the written-off amount ($827. 74) exceeded the total potential restitution ($621.56) . . . .

*Id.* To summarize, the Scenario 2 example described:

> Contrarily, Scenario 2 involves situations wherein the written-off account balance is less than the JWPP purchases. In these situations, the difference is paid in restitution. To illustrate, I use . . . as an example . . . Mr. Robison.  During the Period, Mr. Robison purchased the following JWPP's:
>
> a) One JWPP on May 8.20 14 totaling $79.99;
> b) Two JWPP on November 19, 20 14 totaling $ 159.98;
> c) One JWPP on December 14, 2016 totaling $149.97;
> d) Three JWPP on February 7, 2020 totaling $359.97; and
> e) Three JWPP on March 10, 2020 totaling $359.97 that were subsequently returned.

The 13 JWPP purchases above, including the returned items, collectively total $749.91 . . . The potential restitution owed related to these JWPP purchases is shown in the table below.

| Scenario 2 | | |
| :--- | :---: | ---: |
| **Calculation of Potential Restitution Owed** | | |
| Total JWPP Purchases during the Period [1] | A | $   749.91 |
| F/C Percentage | | |
| Total purchases by consumer [2] | B | 22,602.29 |
| Total finance charges on consumer account [3] | C | 3,285.20 |
| F/C Percentage | D = C/B | 14.54% |
| JWPP Finance Charge | E = A * D | 109.04 |
| Sales taxes | F | - |
| **Total potential resitution** | G = A + E + F | $   858.95 |
| **Notes** | | |
| [1] See footnote 3 on Exhibit 4. | | |
| [2] See footnote 1 on Exhibit 4. | | |
| [3] See footnote 2 on Exhibit 4. | | |

On July 22, 2022, Mr. Robison's balance of $244.32 was written off . . . After calculating the potenlial restitution amount, it was determined that Mr. Robison was owed a restitution amount of $614.63, as the potential restitution amount ($858,95) exceeded the written-off amount ($244.32) . . . This restitution amount was paid to Mr. Robison via check . . ."

*Id.* at 3–5.

On June 2, 2023, the NYAG emailed Mr. Yormark, copying Defense Counsel, offering a

competing refund calculation methodology:

> The multistate group has reviewed your refund memo dated May 30, 2023 ("the Memo"), and while we appreciate the more in-depth explanation of Harris' process in denying refunds to consumers who had amounts written off or had collections ceased, this explanation offers a nonsensical process that is noncompliant with the Order.

> According to this process, Mr. Victor (Scenario 1 and also a real person), who paid off 94.8% of his contract plus finance charges to Harris, was credited $0 of those payments to the $621.56 in JWPP charges (inclusive of finance charges and interest assessed) over the nearly six years he made payments. Clearly this is not the case: he was actually making payments on the total charges, JWPP included, all along, and would have in fact made 94.8% progress towards paying the JWPP plus finances charges in full. The amount of his JWPP written off being $32.32, he is actually entitled to a $589.24 refund under the Order.

> Mr. Robison (Scenario 2 and also a real person) made 99.06% of his payments to Harris before having $244.32 written off, and he should therefore be entitled to 99.06% of his JWPP payments made, totaling $850.88, not the $614.63 he was given. Mr. Robison is owed an additional $236.25.
>
> These refunds to consumers are not a "windfall" as described by counsel-they are mandated under the stipulated consent Order as the "full amount of JWPP purchases paid for by the consumer, and excluding those amounts for which Harris has ceased collections or written off." See Consent Order at X.D. With these two consumers alone, we find that Harris denied at least $825.49 in eligible refunds under the Order.

Nelson Decl. Ex. F.  The NYAG concluded the email by demanding, among other things, that Mr. Yormark, "promptly prepare an audit of the restitution calculations so that this blatant error may be corrected forthwith . . . to be supplied no later than June 12, 2023." *Id.*  The Motion followed shortly after.

### A.  Clear and Unambiguous

Unlike the provisions concerning the website, the Order's provisions concerning the payment of JWPP refunds are ambiguous.  Indeed, the provision in Section X. D. concerning restitution is subject to multiple, reasonable interpretations.  *See* Order § X. D.  While the first part of the provision—"restitution shall be in the full amount of JWPP purchases paid for by the consumer"—is clear enough, the second part of the provision—"and excluding those amounts for which Harris has ceased collections or written off"—is less so.  *Id.*  The obscure, awkwardly worded phrase, "and excluding those amounts," has led the Parties to two reasonable, yet different, interpretations of Section X. D.

Plaintiffs' interpretation focuses on the first part of the provision.  They argue that Section X. D., very simply, requires Defendants to repay consumers the "full" amount they actually paid towards JWPPs.  Indeed, the Order's other sections, such as X. D. 5., supports that interpretation.  Section X. D. 5 states, in part, "Defendants shall . . . refund the **full amount paid by the consumer**

26

**for the JWPP**, including sale tax, finance charges, and any other amounts the consumer paid attributable to the JWPP . . . ."  Order § X. D. 5 (emphasis added).

Plaintiffs argue that the second part of the provision, "and excluding those amounts for which Harris has ceased collections or written off," merely implies that consumers are not entitled to refunds for any outstanding payments that were written off.  *See* Pls.' Mem. Law at 12, 14, 18. This interpretation, while reasonable, does not fully address the meaning of the phrase, "and excluding."  Surely, were Section X. D. as straightforward as Plaintiffs claim, there would be no need for the second part of the provision at all.  The provision could have ended with, "restitution shall be in the full amount of JWPP purchases paid for by the consumer."  As the Court must give effect to the Order's provision *as written*, the Court (and Plaintiffs) cannot disregard the second part of the provision.  *See Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) ("the contract should be construed so as to give full meaning and effect to **all** of its provisions" (emphasis added) (internal citations omitted)).

Defendants, for their part, address the second part of the provision more directly, arguing that the phrase "and excluding" means "subtracted."  Defs.' Br. at 24.  That interpretation, while not the only one, is reasonable.

The Order also fails to proscribe a methodology for Defendants to use to calculate JWPP refunds.  As Defendants note, the Order does not explain how Defendants should account for "varying amortization and payment schedules for purchases and payments made at different points of time."  Defs.' Br. at 25.  The Court hesitates to read a calculation methodology into the Order when sophisticated parties, like the FTC and State Attorneys General, failed to include it themselves.  *See BP Prods. N.A. Inc. v. ExxonMobil Corp.*, 19-CV-3288 (PKC) (ST), 2022 WL 4538555, at *7 (E.D.N.Y. Sept. 28, 2022) ("Courts should be extremely reluctant to interpret an

agreement as impliedly stating something which the parties have neglected to specifically include . . . or impose the court's own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which the parties have committed themselves." (internal citations omitted and quotation marks)).  Moreover, the Order's silence as to how Defendants should fulfill their obligations "lends significant weight to [Defendants'] interpretation."  *Baez*, 533 F.Supp.3d at 144.

As the Order is ambiguous with respect to the calculation of JWPP refunds, the Parties may offer extrinsic evidence of their intent.  *See Pfizer Inc. v. McNeil-PPC, Inc.*, 708 F. App'x 14, 16 (2d Cir. 2017).  While the Parties do not offer much extrinsic evidence on this issue, Defendants cite to another stipulated judgment, to which the NYAG was a party, entered in *State of New York v. Vision Prop. Mgmt., LLC*.  *See* No. 19-cv-7191 (S.D.N.Y. 2019), ECF Nos. 31–34.  Though the facts underlying that action differ from those here, both the proposed and final stipulated judgments in that action have some degree of detail concerning the process for calculating restitution, unlike the Order here.  *See id.*  This fact, too, lends weight to Defendants' interpretation.

## B. Clear and Convincing Proof of Noncompliance & Diligent Attempt to Comply in a Reasonable Manner

As the Order is ambiguous with respect to the calculation of the refunds, the Court concludes that Defendants should not be held in contempt for violation of Section X. D. of the Order.  The Court notes, however, that Defendants have diligently attempted to comply with the Order's requirement to refund JWPP purchases.  *See* Nelson Decl. Exs. A, D.  Defendants have, indeed, already offered, and paid millions of dollars in restitution to thousands of consumers, demonstrating a reasonably diligent attempt to comply with the Order.  *See* Nelson Decl. Ex. A.

### III.    PENALTIES

This Court recommends that the District Court impose remedial penalties to achieve the Order's stated purpose and ensure future compliance with the Court's orders.  *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 146 (2d Cir. 2010) ("Civil contempt sanctions may serve 'dual purposes': securing 'future compliance with court orders' and 'compensa[ting] the party that has been wronged.") (quoting *Paramedics Electromedicina Comercial, Limitada*, 369 F.3d at 657 (alteration in original)); *Manhattan Indus.*, 885 F.2d at 5 ("civil contempt proceedings must be remedial and compensatory, not punitive." (internal citations and quotation marks omitted)).

### A. Recommended Penalties

Plaintiffs request that the Court enter the $24,000,000 stipulated judgment against Defendants, thus allowing Plaintiffs to administer the full relief to consumers.  *See* Pls.' Mem. Law at 5.  Plaintiffs alternatively request "the restoration of the restitution claims portal for the final month set out in the Order, plus the number of days the claims portal was unavailable to consumers in light of the disruption and misrepresentations by Defendants, with robust notice to the consumers."  *See id.*

This Court recommends ordering Defendants to restore the claims portal.  This penalty is tailored to the circumstances giving rise to the Motion—namely, Defendants' premature removal of the claims portal from their website.  Given that Defendants have already offered and paid millions of dollars in restitution to thousands of consumers, requiring Defendants to pay an additional $24 million at this time would only be punitive, and not further the Order's original, stated purpose.[12]  *See* Nelson Decl. Ex. A; Order ¶ 7.

---

[12] Plaintiffs cite several out of Circuit cases in which courts entered large, stipulated judgments for violations of orders. *See* Pls.' Mem. Law at 21–22 (citing *FTC v. Infusion Media*, 656 F. App'x 369, 370 (9th Cir. 2016) (imposing $26

This Court accordingly recommends that the District Court order:

1. Within 30 days of the District Court's issuance of these contempt penalties, Defendants to repost to their website's homepage the entirety of the information shown in Attachment G, including the link to the claims portal;

2. Defendants to simultaneously reopen and reactivate the claims portal to allow submissions from any consumers who have not yet submitted claims;

3. Within 30 days of the District Court's issuance of these contempt penalties, Defendants to file with the Court proof that they have reopened and reactivated the claims portal, and that the information shown in Attachment G is on the homepage of the website;

4. Defendants to keep the information shown in Attachment G on their website, and the claims portal open and activated, for the final month set out in the Order, plus the number of days the claims portal was unavailable to consumers (the "New Claims Period");[13]

5. Within 30 days of the District Court's issuance of these contempt penalties, Defendants to send a third notification letter, in compliance with the terms of Section X. D. 4 of the Order, to any consumer who responded to neither the first nor the second notification letter, at their last known email address;

6. Defendants to offer and pay restitution to every eligible consumer in accordance with the terms of the Order;

---

million suspended judgment); *FTC v. HCG Diet Direct*, No. 14-CV-15 (PHX) (NVW),  2016 WL 647355 at *1 (D. Ariz. 2016) (imposing $3.2 million suspended judgment, with interest); *S.E.C. v. Michael A. Liberty*, 589 F.Supp.3d 469, 493 (E.D.P.A 2022) (imposing over $5 million in suspended disgorgement with post-judgment interest)).  In those cases, however, the defendants' violative behavior included failing to disclose assets, and making false representations to the government.  Here, Defendants' violation does not rise to that level of misconduct or warrant such a penalty.

[13] For the avoidance of doubt, this Court considers the number of days that "the claims portal was unavailable to consumers" to be the number of days from April 20, 2023, to the date that Defendants reopen and reactivate the claims portal.

7.  The Independent Monitor, no sooner than 30 days after the end of the New Claims Period, to issue a written final certification that Defendants have satisfied their obligation to offer and provide JWPP refunds as required under the Order.[14]

## B. Attorneys' Fees

Plaintiffs request "reasonable counsel fees for the necessity of this motion payable to the States." Pls.' Mem. Law at 6. "A court may assess attorney's fees as a sanction for 'willful disobedience of a court order.'" *Chambers*, 501 U.S. at 45 (internal citations omitted) ("a court's discretion to determine '[t]he degree of punishment for contempt' permits the court to impose as part of the fine attorney's fees representing the entire cost of the litigation." (alteration in original)). However, even where attorneys' fees are recoverable, the moving party bears the burden demonstrating reasonableness. *Eastern Sav. Bank, FSB v. Robinson*, No. 13-CV-7308 (ADS) (SIL), 2016 WL 3365091, at *8 (E.D.N.Y. May 9, 2016) *rep. and rec. adopted*, 2016 WL 3102021 (E.D.N.Y. June 2, 2016).

Here, despite that Plaintiffs are potentially entitled to attorneys' fees, *see Chambers*, 501 U.S. at 45, they have not provided sufficient information for the Court to determine a reasonable amount of fees to award this time. This Court therefore recommends granting Plaintiffs leave to formally move for attorneys' fees. Should Plaintiffs so move, their motion should include "a detailed request for attorneys' fees incurred in enforcing" the Order. *1199 SEIU United Healthcare Workers East v. Alaris Health at Hamilton Park*, 18-cv-3336 (JSR), 2019 WL 2546626, *3 (S.D.N.Y. June 20, 2019).

---

[14] Defendants might claim that they are unable to comply with the Court's directive now that Defendants are purportedly out of business. Defs.' Br. at 27. However, Section X. O. of the Order states, "shareholders of the Defendants will guarantee all monetary obligations outlined herein and attest that they will not dissipate assets sufficient to pay 100 percent of potential JWPP refunds, until such time that the Independent Monitor referenced herein provides final certification that Defendants have satisfied their obligation to offer and provide JWPP refunds as required by this Order." Order § X. O. Accordingly, the Order still obligates Defendants' shareholders to guarantee the repayment of all potential JWPP refunds until the Independent Monitor issues the final certification.

Defendants also request fees and costs against the NYAG.  Defendants cite no law in support of their request but argue that the Motion is grounded in baseless assertions and replete with inaccurate statements.  Defs.' Br. at 27.  For all the reasons stated above, this Court finds that Motion is neither baseless nor replete with inaccuracies, and Defendants have not shown entitlement to fees.  This Court therefore recommends denying Defendants' request.

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that the District Court GRANT IN PART and DENY IN PART Plaintiffs' Motion, find Defendants in contempt for their violation of the Order, and impose the remedial penalties described above, including granting Plaintiffs leave to move for attorneys' fees.

## OBEJECTIONS TO THIS REPORT AND RECOMMENDATION

Under 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals.  *See Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 Fed. Appx. 24, 26 (2d Cir. 2009); *Tavarez v. Berryhill*, No. 15-CV-5141 (CS) (LMS), 2019 WL 1965832, at \*30 (S.D.N.Y. May 1, 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


**SO ORDERED.**


                                            /s
                                    _____
                                    Steven Tiscione
                                    United States Magistrate Judge
                                    Eastern District of New York

Dated: Central Islip, New York
September 16, 2024